UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


**MARIA FOERSTER**

       **Plaintiff,**

**V**                                                              **COMPLAINT**

**PRESIDENT MARK SCHLISSEL, an individual,**
**MARSCHALL RUNGE, an individual,**
**NICHOLAS REED DUNNICK, an individual,**
**EVA FELDMAN, an individual,**
**ELLA KAZEROONI, an individual,**
**ASHOK SRINIVASAN,  an individual,**
**KARA MORGENSTERN, an individual,**
**TIMOTHY LYNCH, an individual,**

**Jointly and Severally, Defendants.**

---

MARIA FOERSTER (In Pro Per)
3507 Veralta Drive
Cedar Falls, IA 50613
Phone: (626) 272-7393
petroumyria75@gmail. com


**TRIAL BY JURY DEMANDED**

**COMPLAINT**

NOW COMES plaintiff, MARIA FOERSTER, in pro per who states in support of her complaint:

**I.  INTRODUCTION**

1.    This case involves numerous civil and constitutional rights violations perpetrated by and

      through numerous members of the University of Michigan leadership against Maria Eva

      Foerster and her family including her parents and brother.

2.     The violations started after a sexual misconduct case was reported to University of Michigan leadership involving NIH R01 Grant NS082304 which was 3+ million dollar grant funded by the NIH in 2014 and granted to the Regents of the University of Michigan (UM).  The NIH grant was the world's largest imaging trial for amyotrophic lateral sclerosis (ALS).

3.     Maria Foerster's father, Dr. Bradley Foerster, MD PhD, was a Co-Principal Investigator on the NIH R01 Grant.  Maria Foerster's mother,  Dr. Myria Petrou, MA MBChB MS, was a non-funded Co-Investigator.  World renowned neurologist Dr. Eva Feldman was a funded Co-Investigator on the grant.

4.     Maria Eva Foerster is named after Maria Kofterou Petrou, her maternal grandmother and Dr. Eva Feldman long term mentor of Bradley Foerster based on Kofterou-Petrou's and Feldman's commitment to look out for Maria Eva and act in Maria Eva Foerster's best interests.

5.     Dr. Foerster and Dr. Petrou served as witnesses and supported Ms. Duaa Altaee, the research coordinator of the NIH R01 grant, who reported sexual harassment against Dr. Robert Welsh, a Co-Principal Investigator on the grant.

6.     The University of Michigan ran a sham investigation of the sexual harassment complaint and committed numerous violations of Title IX.

7.     The University of Michigan later weaponized the results of the sexual harassment investigation against Dr.  Foerster's employment at the University of Michigan.

8.     Following, an unidentified witness "Nick" appeared who claimed to be a colleague of University of Michigan faculty Paul Cronin.  "Nick" made false criminal and sexual

allegations against Maria Foerster's parents and grandmother which ultimately led to the eviction of Maria Foerster and her family from their new house in Ann Arbor, Michigan.

9.  Several parties at the University of Michigan of Michigan refused to investigate "Nick" including then Chair of Radiology Dr. Reed Dunnick and the University Title IX Office. The University of Michigan Office of General Counsel including Lead Deputy Counsel Kara Morgenstern solicitated further false allegations from "Nick" against Drs. Foerster and Petrou and the family and ran a secret, sham investigation into the identity of "Nick."

10. In December 2017, Dr. Eva Feldman terminated Duaa Altaee despite Ms. Altaee being on approved medical leave for PTSD secondary to the sexual harassment case. Following, despite Maria Foerster having a close personal relationship (and being named after Eva Feldman), Dr. Feldman has refused to help Maria Foerster and instead interfered with her parents employments and has made repeated threats through attorneys against Maria Foerster's parents.

11. In September 2018, Dr. Myria Petrou resigned under false pretenses from the University of Michigan due to a hostile and unsafe work environment following her serving as a witness to Ms. Altaee's sexual harassment complaint.  Then Interim Radiology Chair Dr. Ella Kazerooni accepted the resignation letter which was obtained under false pretenses and then initiated a University of Michigan police investigation of Dr. Petrou's resignation in an effort to discredit Dr. Petrou.

12. The University of Michigan Police have conducted numerous secret investigations against Dr. Foerster and Dr. Petrou in an effort to discredit them including 5.09 proceedings against Dr. Foerster which were initiated and rubberstamped by University of Michigan President Mark Schlissel and Medical School Dean Marschall Runge.

13. University of Michigan Deputy Lead Counsel Kara Morgenstern and Lead Counsel Timothy Lynch refused to investigate the identity of HHS-OIG Special Agent "Tyson Howard" who was used against Dr. Foerster's employment by the University of Michigan.  No one has been able to locate "Tyson Howard" to date.

14. Specifically, University of Michigan Medical School Dean Marschall Runge, used the HHS-OIG "investigation" of NIH R01 Grant NS082304 to rubberstamp sham 5.09 proceedings against Dr. Foerster.

15. President Mark Schlissel used fabricated mass emails to label Dr. Foerster as "non-credible" to rubberstamp the sham 5.09 proceedings against Dr. Foerster and to recommend Dr. Foerster's termination from the University of Michigan.

16. Given the hostile environment including the sham 5.09 proceedings, Dr. Foerster resigned in good standing from the University of Michigan on June 23, 2019.

17. Dr. Ella Kazerooni went on to issue a "Do Not Rehire" statement against Dr.  Foerster.

18. Following, the University of Michigan, and specifically Dr. Ella Kazerooni, has repeatedly interfered with employment opportunities for Dr. Foerster and Dr. Petrou including current employment.

19. Dr. Ashok Srinivasan repeatedly refused to interview Plaintiff's mother Dr. Petrou in 2019 and 2020 even though Dr. Petrou was clearly qualified for the posted faculty position per Dr. Srinivasan's own assessment.

20. The Ann Arbor Observer published four defamatory articles against Drs. Foerster and Petrou and the family serving the interests of the University of Michigan leadership. Following, the Ann Arbor Observer has refused to retract the defamatory articles or publish a new article based on new documentary evidence proving that the Observer's

4

articles/statements are inaccurate.  The Ann Arbor Observer was unable to explain to a federal judge how the current online articles serve the public interest.

21. As a result of the above violations, Maria Foerster has effectively been rendered a refugee in her own country and has been forced out of Ann Arbor after losing her house which destroyed her relationships with friends and has been forced to moved numerous times in order for her parents to obtain employment as practicing physicians in spite of her parents having no patient complaints, malpractice or criminal history.

## II.    JURISDICTION AND VENUE

22. The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

23. Plaintiff Maria Foerster is a resident of the City of Cedar Falls, County of Black Hawk, State of Iowa and has lived in Iowa with her parents since November 13, 2021.

24. Defendants were employed at the University of Michigan which was at all times relevant, a Michigan public institution with an address of 500 S. State Street, Ann Arbor, Michigan 48109.  Defendants are all residents of the State of Michigan.

25. Jurisdiction is conferred by 28 U.S.C. § 1332 given diversity of state citizenship and amount in controversy exceeding $75,000.

26. Jurisdiction and venue are proper in this court as Defendants are residents of the State of Michigan with their principal place of business in Ann Arbor, Michigan.

## III.  PARTIES

27. The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

28. Plaintiff Maria Foerster is a bright, resourceful and kind thirteen year-old. Maria Foerster has been publicly recognized for her sense of social justice including being lauded by United States Senator Corey Booker for reporting bullying and protecting her fellow

students while a first grader at Angel Elementary School, Ann Arbor, Michigan.  Maria Foerster's parents Dr. Bradley Foerster and Dr. Myria Petrou have been married since October 3, 2004. Maria Foerster's father, Dr. Bradley Foerster, was an Associate Professor of Radiology who received tenure on September, 2016 due to his national academic reputation for his scholarly efforts for amyotrophic lateral sclerosis (ALS) and chronic pain.  Maria Foerster's mother, Dr. Myria Petrou, was an Assistant Professor at the University of Michigan and had been approved for tenure due to her national reputation for her scholarly efforts for neurodegenerative diseases before Dr. Petrou being forced to resign due a toxic and hostile work environment at the University of Michigan in September 2018.  Maria Foerster lives with both parents and her twelve year old brother, Peter Foerster. Maria Foerster's grandmother, Maria Petrou, is visiting from Cyprus and is currently staying with the family in Cedar Falls, Iowa.

29. President Mark Schlissel is the President of The University of Michigan which is the number one public research university in the United States with $1.48B in research expenditures.  The University of Michigan employs over 33,000 employees and has over $8B in total revenue for operating budget, one-third of the gross domestic product for Washtenaw County, Michigan.  Michigan Medicine is a top 10 best health system in the United States according to the U.S. News and World Report.

30. To date, President Mark Schlissel has refused to speak with the survivors of the Dr. Anderson sexual abuse.

31. Dr. Marschall Runge is the Dean of the Medical School of the University of Michigan.

32. Dr. Nicholas Reed Dunnick is the former Chair of Radiology at the University of Michigan.

33. Dr. Eva Feldman was the former head of the Taubman Medical Research Institute and is a Professor of Neurology at the University of Michigan.

34. Dr. Ella Kazerooni is a Professor of Radiology and the former Vice-Chair of Clinical Affairs and former Interim Chair of Radiology at the University of Michigan.

35. Kara Morgenstern is the Deputy Lead Counsel of the University of Michigan.

36. Timothy Lynch is the Lead Counsel of the University of Michigan.

## IV. STATEMENT OF FACTS

37. The Plaintiff Maria Foerster hereby incorporates the preceding paragraphs as if fully restated herein.

38. Plaintiff Maria Foerster was born in Baltimore, Maryland while her parents Dr. Foerster and Dr. Petrou were training at the Johns Hopkins Hospital.

39. Plaintiff Maria Foerster moved to Ann Arbor, Michigan after then Chair of Radiology Dr. Reed Dunnick and then Director of the Taubman Medical Institute Dr. Eva Feldman recruited her parents back to the University of Michigan as Maria's parents had been previously educated/trained at the University of Michigan.

40. Dr. Eva Feldman had been Dr. Foerster's mentor since he did a M4 rotation with Dr. Feldman in 1998 with Dr. Foerster and Dr. Petrou naming their daughter, Maria Eva Foerster, in recognition of the special relationship and Eva's commitment to the newborn girl.

41. In spite of what happened, Plaintiff Maria Foerster still considers Ann Arbor, Michigan her "home" having lived in Ann Arbor from 2009-2018.

42. Plaintiff Maria Foerster's father, Dr. Foerster, was promoted to Associate Professor of Radiology (with tenure) on September 1, 2016 based on his national recognition for academic excellence.

43. NIH R01 Grant NS082304 was a 3+ million dollar grant funded by the NIH in 2014 and granted to the Regents of the University of Michigan (UM).

44. The grant was the largest imaging trial for amyotrophic lateral sclerosis (ALS).

45. The Co-Principal Investigators on the NIH grant were Dr. Bradley Foerster, MD, PhD and Dr. Robert Welsh, PhD.

46. Professor Eva Feldman, a world renowned neurologist, was a funded Co-Investigator on the grant.

47. Dr. Myria Petrou, MA MBChB MS, was a non-funded Co-Investigator on the grant.

48. Ms. Duaa Altaee was hired as the research coordinator under the grant after unanimous decision by the investigators on the grant.

49. In 2015, upon Dr. Feldman's recommendation, Ms. Altaee and Dr. Foerster reported Dr. Welsh to the Office of Institutional Equity (OIE), the UM Title IX office, for sexual misconduct/retaliation.

50. Prior to reporting sexual harassment/serving as a witness for sexual harassment/misconduct, neither Dr. Foerster nor Dr. Petrou had any issues at the University of Michigan.

51. In addition, Ms. Altaee reported the UM Department of Radiology for retaliation/lack of due process.

52. After a year, UM OIE released to Dr. Foerster the results of the investigation into his complaint stating that there was insufficient evidence to establish a claim of retaliation.

53. The investigation was a sham as among other issues it excluded 13/17 of Dr. Foerster's pieces of evidence (including an email demonstrating that Dr. Welsh was trying to secretly obtain a key to Ms. Altaee's office).

54. UM OIE refused Dr. Foerster an appeal.

55. UM OIE never released a copy of Ms. Altaee's report to her.

56. Subsequently outside attorney Daniel Tukel presented an OIE report for Ms. Altaee at Dr. Foerster's 5.09 proceedings in November, 2018.

57. The OIE report for Ms. Altaee designated Ms. Altaee as a "reportee", a violation of Title IX.

58. The OIE report for Ms. Altaee, omitted Ms. Altaee's 10+ pieces of evidence.

59. The OIE report for Ms. Altaee used a weather forecast rather than the actual weather report to label Ms. Altaee as a "liar."

60. Mr. Tukel echoed the labeling of Ms. Altaee as a "liar" during the 5.09 proceedings of Dr. Foerster.

61. Following the conclusion of the OIE investigations in April 2016, Dr. Petrou, Dr. Foerster and Ms. Altaee by research coordinator Sara Abraham, including a fabricated HIPAA violation.

62. Sara Abraham was terminated for cause by Dr. Petrou after Dr. Petrou consulted with HR representative Ashanta Boarden who encouraged Dr. Petrou to terminate Ms. Abraham given the issues at hand.

63. While advising Dr. Petrou to terminate Ms. Abraham, and unbeknownst to Dr. Petrou Ms. Boarden was encouraging Ms. Abraham to come forward with her false allegations against Dr. Petrou, Dr. Foerster and Ms. Altaee.

64. The University of Michigan never informed Dr. Petrou of the full spectrum of allegations filed by Ms. Abraham and never informed Dr. Petrou that Ms. Abraham filed her allegations with HHS OCR.

65. HHS OCR closed the entire Sara Abraham complaint as non-credible given that there was no basis for a HIPAA violation, as claimed by Ms. Abraham.

66. University of Michigan continued to "investigate" the fabricated allegations but to this date has refused to release how Sara Abraham's allegations were adjudicated or any final investigation report, despite an ongoing litigated FOIA appeal, aside from an email confirming the HHS OCR findings that there was no basis for a HIPAA violation allegation on behalf of Ms. Abraham.

67. Following the general false allegations filed by Sara Abraham against Dr. Petrou, Dr. Foerster and Ms. Altaee, Sara Abraham went on to file false allegations of data fraud against Dr. Foerster which were investigated by Dr. Ashton Miller and Dr. Sana Shakour in the winter of 2017 and found to be unsubstantiated.

68. Instead, Ms. Altaee was terminated by Dr. Eva Feldman in December 2017.

69. Ms. Altaee was on medical leave for post-traumatic stress disorder (PTSD) resulting from the harassment and retaliation as documented by her physician.

70. In 2018, UM released Ms. Altaee's OIE sham investigation which among other things excluded her 10+ pieces of evidence, designated Ms. Altaee as "reportee" (when there is no designation of "reportee" under Title IX), and used a weather forecast rather than the actual weather report to label and brand Ms. Altaee as a "liar."

71. The retaliation by Dr. Welsh hindered and obstructed the execution of the NIH R01 grant.

72. In summer of 2015, Senior University of Michigan administration/faculty including Dr. Daniel Clauw, Dr. Eva Feldman, Dr. Richard Cohan, Dr. Ted Lawrence, and Dr. David Pinsky recommended that Dr. Welsh be removed from the grant.

73. Dr. Dunnick initially agreed to removed Dr. Welsh and subsequently changed his mind.

74.   In spite of this, Dr. Foerster and Ms. Altaee in 2015-2017 were able to enroll nearly 100 research subjects.

75.   In June 2016, Dr. Welsh abruptly left UM for a faculty position at University of Utah without explanation shortly after Dr. Foerster's OIE report was released.

76.   Subsequently, UM repeatedly pressured Dr. Foerster to execute a subcontract for Dr. Welsh.  Dr. Foerster deferred.

77.   In the end, Dr. Dunnick assumed a "managing-PI" role and authorized over $100K in subcontract payments to Dr. Welsh/University of Utah.

78.   Later, Dr. Foerster discovered that there is no managing-PI role per the NIH.

79.   Dr. Foerster informed both the University of Michigan that there is no managing-PI role but was ignored.

80.   Dr. Foerster informed also informed the University of Utah that there is no managing-PI role but was ignored.

81.   For the 2015, 2016, and 2017 annual NIH reports as well as the final 2018 close-out NIH report,  Dr. Welsh documented no data analysis (and no work during 2018).

82.   Documenting the work effort under a NIH annual report is a requirement of the contract.

83.   Dr. Foerster documented his efforts for clinical recruitment, phenotyping and his data analysis as delineated under the NIH Multi-PI agreement.

84.   Starting in August 2016, Paul Cronin, informed Dr. Foerster and Ms. Altaee that he was not trained as a physician despite being employed as a radiologist at UM.

85.   Recently, Dr. Foerster and Dr. Petrou have discovered through FOIA that University of Michigan had no medical school transcripts on file for Paul Cronin despite Cronin being employed as a physician at the University of Michigan.

86. Recently, the University of Michigan, after a litigated FOIA appeal, admitted that it had no medical school transcripts on file for Paul Cronin's wife, Aine Kelly, despite Kelly employed as a physician at the University of Michigan.

87. All prior academic transcripts are a requirement for University of Michigan graduate school with Paul Cronin having received on Master's degree and Aine Kelly receiving two Master's degrees from UM.

88. In August 2016, Cronin provided extensive detail of what Cronin claimed was a Russian scheme to subvert the 2016 U.S. Presidential Election as well as a money laundering operation in the State of Michigan.

89. Paul Cronin would come over to Plaintiff Maria Foerster's grandmother's house at 3672 Wellington Cross, Ann Arbor, Michigan to tell Maria Foerster's father this information.

90. During Paul Cronin's visits to 3672 Wellington Cross in August 2016, Plaintiff Maria Foerster witnessed Paul Cronin frequently disappearing into the bathroom and texting on his phone.

91. Immediately following disclosure of Cronin's "sensitive" information, Maria Foerster and her family found themselves victims of numerous false witnesses which were used by the Ann Arbor Police Department (AAPD) and the University of Michigan to target the family.

92. Now, given everything that happened and in retrospect, Paul Cronin's statements (which proceeded but mirrored the Steele Dossier) regarding the Russian interference of the 2016 U.S. Presidential Election appear to be entirely fabricated and once again were used to make Maria Foerster and the family targets.

93. Dr. Petrou suffered a miscarriage in February 2017 at 12 weeks' gestation.

94. Dr. Petrou received her care at the University of Michigan for the pregnancy and miscarriage under Dr. Anita Malone, faculty at University of Michigan.

95. In February and March 2017, Dr. Foerster and Dr. Petrou discovered that their bank accounts were frozen by search warrants executed by the Ann Arbor Police Department (AAPD) based of "embezzlement" allegations by Plaintiff Maria Foerster's grandmother, Maria Petrou following a family dispute.

96. Plaintiff Maria Foerster grandmother, Maria Petrou, later admitted that it was Maria Athanassiou-Papaefthymiou who had close contacts with the University of Michigan who brought in the Ann Arbor Police as opposed to assisting Maria Petrou in resolving the family dispute with her children via mediation/as a simple civil matter.

97. The search warrants were executed by the AAPD despite there being a broad power of attorney under which there could be no embezzlement as a matter of law.

98. To date, the AAPD/City of Ann Arbor has not established a probable cause file for the search warrants despite a court order to do so and in spite of Michigan Attorney General Dana Nessel informing Drs. Foerster and Petrou that such a file should exist.

99. In addition to the false "embezzlement" allegation, Drs. Foerster and Petrou have been falsely accused and under investigation by AAPD of "embezzlement", "extortion" of Paul Cronin, stealing two stray orange cats, and cyber-bullying of Ms. Altaee's former husband for simply asking for their belongings back.

100. The AAPD ran one-sided investigations against Plaintiff Maria Foerster's parents, Dr. Foerster and Dr. Petrou, regarding the embezzlement, extortion, cat stealing and cyber-bullying allegations.

101. In April 2017, Maria Petrou informed the AAPD that she wished to withdraw her allegations.

102. Shortly afterwards, an unidentified character by the name of "Nick" who claimed to be a colleague of Cronin's at the University of Michigan appeared who made false criminal allegations that Dr. Foerster and Dr. Petrou were extorting Paul Cronin.

103. Subsequently, Paul Cronin repeatedly denied under oath any extortion by Dr. Foerster or Dr. Petrou.

104. In spite of Paul Cronin's denials under oath, the AAPD used "Nick's" false allegations to maintain the freeze on Dr. Foerster's and Dr. Petrou's bank accounts sending their new house into foreclosure and ultimately Sheriff's sale.

105. Concurrently, UM Radiology Chair Dr. Reed Dunnick refused to investigate the identity of "Nick" even though "Nick" had made calls from the University of Michigan Hospital switchboard (734-232-0000) to make false criminal allegations against Dr. Foerster and Dr. Petrou.

106. In fall 2017, the UM Office of General Counsel/Kara Morgenstern solicited false allegations from "Nick" and then ran a sham investigation into the identity of "Nick."

107. The UM Office of General Counsel/Deputy Lead Counsel Kara Morgenstern never interviewed Dr. Foerster or Dr. Petrou or Paul Cronin regarding "Nick" with the investigation only revealed during Dr. Foerster's subsequent 5.09 proceedings in an effort to discredit Dr. Foerster.

108. In 2020, Drs. Foerster and Petrou learned that Dr. Nicholas Reeser (who was a radiology fellow under Cronin at the time) appeared to be a voice match for "Nick."

109. Although Cronin denied any knowledge of "Nick" as well as any extortion by Drs. Foerster or Petrou under oath in a June 2017 deposition, Cronin will now not reply as to whether he recognizes "Nick's" voice (obtained through "Nick's" recordings which the AAPD used to continue its investigation after Plaintiff Maria Foerster's grandparents dropped their allegations).

110. As a direct result of "Nick's" false criminal allegations, Plaintiff Maria Foerster and her family were evicted from their house and property at 630 and 620 Geddes Ridge, Ann Arbor, Michigan in May 2018.

111. As a result, Plaintiff Maria Foerster and her family lost their new house and all of their assets.

112. Subsequently 630/620 Geddes Ridge was purchased by prominent University of Michigan faculty members, Professors Betsey Stevenson and Justin Wolfers.

113. Betsey Stevenson was a former Obama cabinet official and advisor to Joe Biden.

114. In May 2017, Plaintiff Maria Foerster's parents Dr. Foerster and Dr. Petrou hired attorney Cyril Hall to represent them.

115. On July 15, 2017, Dr. Petrou informed the OIG "I have been a coinvestigator on NIH Grant R01 NS082304 at the University of Michigan. One of the investigators (Robert Welsh, PhD) has not fulfilled their contractual obligations with the NIH and has not performed data analysis for 3+ years despite salary support for him and his assistants from the grant."

116. In July 2017, Dr. Foerster, Dr. Petrou, Paul Cronin and Paul Cronin's wife Aine Kelly signed a complaint to the University of Michigan Office of General Counsel (OGC) regarding concerns about the billing practices in the Department of Radiology.

117. Paul Cronin asked Dr. Foerster (given that Dr. Foerster was tenured and therefore enjoyed additional protections) to join in the complaint as Paul Cronin said he was afraid retaliation by his direct supervisor, Dr. Ella Kazerooni, who was directly named in the complaint to the UM OGC.

118. Paul Cronin dictated the letter to Dr. Petrou while Dr. Foerster was in the adjacent room.

119. Following, the University of Michigan retained legal firm Hall Render to investigate the NIH grant as well as the billing concerns.

120. During this investigation Paul Cronin and Aine Kelly falsely stated that the billing concerns originated from Dr. Foerster.

121. When confronted with the false statement by Dr. Petrou, Cronin stated that he lied because he was afraid of his supervisor, Dr. Ella Kazerooni.

122. Subsequently, Aine Kelly falsely claimed that Dr. Foerster wrote the complaint even though Aine Kelly was not physically present at the time.

123. Immediately following the reporting of the radiology department billing concerns, "Nick" resurfaced and now made false sexual allegations against Dr. Petrou falsely claiming that she had an affair with Cronin, that Dr. Petrou's and Dr. Foerster's son was really Cronin's son and this fabricated sex scandal was the basis of the extortion of Cronin.

124. Dr. Petrou only found out about these false sexual allegations from "Nick" in October of 2017 and reported them to the University of Michigan Office of Institutional Equity.

125. The Office of Institutional Equity contacted Paul Cronin 18 times but Cronin refused to cooperate with the investigation.

126. Paul Cronin was not compelled to cooperate with the investigation despite UM Lead Counsel Timothy Lynch informing Dr. Petrou and Dr. Foerster that the University can compel faculty members to cooperate with university investigations.

127. Also, following the reporting of the grant and billing concerns in 2017, Dr. Foerster and Dr. Petrou faced extensive retaliation against her career at the University of Michigan in terms of grant funding, collaborations, scheduling etc.

128. On August 2, 2017, Dr. Foerster called Paul Cronin. After several minutes of conversation, Dr. Foerster asked Cronin if Cronin was impersonating a federal officer. Cronin denied impersonating a federal officer but then abruptly hung up and would not answer follow-up phone calls or texts from Dr. Foerster.

129. More recently, Dr. Petrou received information that Paul Cronin has been using a law enforcement (federal?) badge to intimidate and manipulate parties against Drs. Foerster and Petrou.

130. Given the seriousness of this, Dr. Foerster made appropriate inquiries. To date, the FBI has refused to confirm or deny if Paul Cronin is or was a federal officer/agent.

131. In August 2017, Dr. Foerster went on approved medical leave for a back injury.

132. In August 2017, Dr. Foerster was approved for FMLA by the University of Michigan for the back injury.

133. In September 2017, the Ann Arbor Veteran's Administration (VA) issued a "termination" letter to Dr. Foerster based on a fabricated AWOL charge.

134. The Ann Arbor VA is a Dean's VA under the University of Michigan.

135. The University of Michigan including Chair Dr. Dunnick, Vice-Chair of Clinical Affairs Dr. Ella Kazerooni and radiology HR was included in the communications regarding the

"termination" letter while Dr. Foerster was on approved FMLA by the University of Michigan.

136. In October 2017, the U.S. Department of Labor informed Dr. Foerster that since the University of Michigan was Dr. Foerster's primary employer (UM assigned Dr. Foerster to work part-time at the VA, all benefits and salary raises through UM), the VA could not have "terminated" Dr. Foerster in the way that it did.

137. Following in summer of 2018, then Interim Radiology Chair Dr. Ella Kazerooni informed Dr. Foerster that per UM Deputy Counsel Kara Morgenstern that the University of Michigan had a special contract with the VA and that FMLA did not apply.

138. Later Dr. Foerster, discovered that the "termination" was never documented including never being reported to the National Practitioner Data Bank as required per VA protocol.

139. Dr. Foerster also subsequently obtained his records from the VA documenting that there was no AWOL designation ever attributed to Dr. Foerster.

140. Dr. Foerster was subsequently employed by the Iowa City VA from 2020-2021.

141. In August 2017, the University of Michigan hired outside law firm Hall Render to investigate NIH R01 Grant NS082034 and the radiology billing practices at University of Michigan.

142. On October 4, 2017, Dr. Foerster informed the University of Michigan that he was going to have back surgery would not return to work for several weeks.

143. On October 5, 2017, the HHS-OIG administratively closed Dr. Petrou's complaint without interviewing Dr. Petrou, Dr. Foerster or Ms. Altaee.

144. Upon information and belief, the University of Michigan used Dr. Foerster's announcement of back surgery to claim that Dr. Foerster was not available and that the HHS-OIG could not therefore conduct an investigation.

145. After October 5, 2017, Dr. Petrou received phone calls from a "Tyson Howard" stating that he was an OIG agent investigating NIH R01 Grant NS082304 and wanted to come to Dr. Petrou's house to talk to her even though Dr. Petrou offered to meet him at his office.

146. In December 2017, the University of Michigan terminated the IRB for NIH R01 Grant NS082304 as Dr. Foerster was the IRB PI and was still on approved medical leave.

147. The University of Michigan refused to appoint Dr. Petrou as a substitute IRB PI on the grant even though Dr. Petrou was IRB PI for more complicated research protocols involving the same population of research subjects.

148. Despite lack of a functioning IRB, the University of Michigan continued to bill the NIH for over $100K for Grant NIH R01 NS082304 without Dr. Foerster's knowledge.

149. On January 31, 2018, Drs. Foerster and Petrou wrote Special Counsel Mueller regarding Paul Cronin's statements regarding the Russian scheme to subvert the 2016 U.S. Presidential Election.

150. Mr. Mueller never replied.

151. On February 5, 2018, Drs. Foerster and Petrou reported the statements of Paul Cronin including the Russian meddling in the 2016 U.S. Presidential Election to Special Agent Bobbi of the Detroit FBI Field Office.

152. Drs. Foerster and Petrou were very clear that they were just reporting what Cronin had told them and that they were still at a loss as what to make of the entire scene but given

that enough bizarre things had taken place they felt it was appropriate to report this to the FBI. FBI Special Agent Bobbi concurred.

153. In April 2018, again Drs. Foerster and Petrou suggested to Paul Cronin that it may be time for him to come forward and give information to law enforcement regarding what he knew about the Russian interference in the 2016 elections and the Russian money laundering scheme he had described months earlier.

154. Paul Cronin had previously promised to provide testimony to the appropriate authorities when the time was right.

155. Paul Cronin refused to come forward and provide testimony and specifically said that if he did that "his life would be ruined."

156. On May 18, 2018, Drs. Foerster and Petrou wrote Deputy Attorney General Rosenstein and Special Counsel Mueller regarding Cronin's statements regarding the Russian scheme to subvert the 2016 U.S. Presidential Election.

157. Neither Mr. Rosenstein nor Mr. Mueller replied.

158. After obtaining a copy of the Mueller/Rosenstein letters, the Ann Arbor Observer published four defamatory articles against Drs. Foerster and Petrou among other things ridiculing Drs. Foerster and Petrou for writing the letters to Mr. Rosenstein and Mr. Mueller.

159. Following, the Ann Arbor Observer has refused to retract the defamatory articles or publish a new article based on new documentary evidence proving that the Observer's articles/statements are inaccurate.

160. The Ann Arbor Observer was unable to explain to a federal judge how the current online articles serve the public interest.

161. Upon information and belief, as well as the fact of the double-standard employed by the Ann Arbor Observer with the Observer publishing a letter by Dr. Welsh's attorney but refusing to publish a letter by Dr. Foerster/Dr. Petrou, the Ann Arbor Observer is a de facto agent of the Defendants named in this lawsuit.

162. In February and March, 2018, Dr. Foerster was informed by Dean Dr. Ray Hutchinson and the Office of General Counsel that UM was transferring the NIH R01 grant to Dr. Welsh/University of Utah against Dr. Foerster's protestations and while Dr. Foerster was still on approved medical leave following two back surgeries.

163. Unbeknownst to Dr. Foerster at the time, University of Michigan under the direct watch of Lead Counsel Timothy Lynch signed a federal form falsely claiming that Dr. Foerster wished to transfer to the grant to Dr. Welsh/University of Utah.

164. In Spring 2018, Dean Dr. Ray Hutchinson banned Dr. Foerster from applying for further research grants citing the "ongoing" OIG investigation as a basis.

165. UM Lead Counsel Timothy Lynch as well as others were aware that Dr. Hutchinson banned Dr. Foerster from applying for further research grants based on the OIG investigation.

166. As documented in this complaint, the OIG investigation cited by Dr. Hutchinson was administratively closed in October, 2017.

167. On March 2, 2018 on a Friday afternoon, Dr. Petrou and Dr. Foerster met with Special Agent Tyson Howard and FBI Special Agent Sue Lucas at the Ann Arbor FBI office.

168. Dr. Petrou and Dr. Foerster were escorted from downstairs by Agent Lucas in the federal building up to the FBI office and ushered into a small interview room through the back door.

169. Agent Howard never showed Dr. Foerster or Dr. Petrou his federal badge; instead Agent Howard handed them his business card.

170. Agent Howard and Agent Lucas asked only cursory questions regarding the NIH R01 grant.

171. Both agents asked numerous questions regarding Dr. Foerster's and Dr. Petrou's relationship with Ms. Altaee trying to falsely assert it was "abnormal."

172. Special Agent Tyson Howard specifically said to Dr. Foerster that "white guys" from "small towns in the thumb of Michigan" do not help young Muslim females.

173. Dr. Foerster said that in fact his family and his church taught him exactly the opposite, that you always try to help someone in need.

174. Both agents asked bizarre questions about a character "Shonda" who neither Dr. Foerster or Dr. Petrou had any knowledge of.

175. The agents informed Drs. Foerster and Petrou that the FBI would not investigate their police corruption concerns regarding the Ann Arbor Police stating that the civil federal RICO case recently filed by Drs. Foerster and Petrou and their attorney Cyril Hall precluded an FBI investigation.

176. When Dr. Foerster asked if the FBI would investigate a murder if there was a civil wrongful death suit, Agent Howard became irate and started pounding on the table.

177. Shortly after the March 2, 2018 interview, Paul Cronin claimed he was interviewed by Agents Howard and Lucas in the Department of Radiology at UM.

178. Following, Paul Cronin informed Dr. Foerster, Dr. Petrou and Ms. Altaee that he had lied to Agents Lucas and Howard.

179. According to Paul Cronin, Cronin did not disclose the election interference scheme or money laundering operation to Agents Lucas and Howard.

180. In July 2018, Ms. Altaee was interviewed by Agents Howard and Lucas after they showed up unannounced at her residence in Washington, D.C.

181. Ms. Altaee's physical description of Agent Howard did not match Dr. Foerster's or Dr. Petrou's.

182. Dr. Petrou submitted her application for promotion and tenure to the Department of Radiology in April 2018.

183. Dr. Petrou was recommended for promotion and tenure by the Department of Radiology promotions committee in June/July 2018.

184. In the summer of 2018, Dr. Petrou and Dr. Foerster found out that Dr. Reed Dunnick and Deputy Lead Counsel Kara Morgenstern were making false and outlandish criminal allegations against Dr. Petrou and Dr. Foerster to the UM Police and the FBI.

185. Neither the UM Police/FBI nor the relevant parties ever informed Dr. Petrou or Dr. Foerster about any concerns.

186. Dr. Petrou and Dr. Foerster also later found out that Deputy Lead Counsel Kara Morgenstern in the summer of 2018 was trying to use a "contempt of court" allegation without a signed court order and via a court proceeding with numerous other violations, all over false and ridiculous allegations of stolen and "counterfeit" orange cats to deprive Dr. Petrou and Dr. Foerster of their medical licenses.

187. In July 2018, Dr. Petrou also wrote to the Office of Clinical Affairs asking them to correct the medical record with respect to her reproductive history and miscarriage, offering recordings of her doctor visits to substantiate the needed corrections.

188. Michigan Medicine has repeatedly refused to correct Dr. Petrou's medical record.

189. Adding insult to injury, Dr. Eva Feldman, in July 2018 banned Dr. Petrou from the ALS clinic citing an "ongoing OIG investigation" as justification.

190. This made execution of an ALSA grant impossible, which was important to Dr. Petrou's application for promotion and tenure.

191. Dr. Petrou and Dr. Foerster recently found out that the OIG investigation of her concerns regarding NIH R01 Grant NS082304 was administratively closed in October 2017.

192. Dr. Petrou and Dr. Foerster have also recently discovered that the FBI was also involved the investigation of NIH R01 Grant NS082304.

193. The University of Michigan never disclosed that the FBI was also involved in the investigation of the NIH R01 grant.

194. Upon information and belief, the FBI was included in the NIH grant investigation to allow the University of Michigan to delay/obstruct the investigation of the NIH R01 grant and suppress how the investigation was conducted with no report of the investigation being released to date.

195. Upon information and belief, this was part of the scheme to delay/obstruct the investigation until the University of Michigan could force out Dr. Foerster, Dr. Petrou, and Ms. Duaa Altaee.

196. In July 2018, after two back surgeries and being on approved medical leave, Dr. Foerster returned to work at the University of Michigan still on part-time disability.

197. In June and July 2018 and while still on medical disability, Dr. Foerster was subjected to two psychiatric evaluations based on hearsay by then Interim Chair of Radiology Dr. Kazerooni without documentation, while on disability.

198. Dr. Foerster was also subjected to a drug test even though Dr. Foerster was informed by psychiatrist Dr. Brower that there were no concerns for drug use/abuse.

199. Subsequently, the University of Michigan has refused to release the medical record of the psychiatric interviews by Dr. Brower to Dr. Foerster.

200. In July 2018, Dr. Foerster was informed by Dr. Kazerooni, Dr. Hutchinson and Neuroradiology Division Chief Dr. Ashok Srinivasan that NIH R01 Grant NS082304 was transferred to Dr. Robert Welsh/the University of Utah.

201. Dr. Kazerooni and Dr. Hutchinson also informed Dr. Foerster in July, 2018 that his computers were transferred to the University of Utah/Dr. Welsh without his consent.

202. Dr. Kazerooni attempted to obtain Dr. Foerster's password to obtain access to Dr. Foerster's personal computer which was stored in his laboratory.

203. Dr. Foerster's personal computer was never returned to him.

204. In July 2018, Dr. Foerster and Dr. Petrou discovered that there were two "hits" at the Washtenaw County Child Protective Services against Dr. Foerster.

205. The two Child Protective Service "hits" subsequently disappeared.

206. Paul Cronin had previously informed Drs. Foerster and Petrou that family members and friends had been recruited to make false Child Protective Services allegations against Dr. Foerster and Dr. Petrou.

207. In July 2018, given everything and the hostile and unsafe work environment, Dr. Petrou who was in California at the time, asked then Interim Chair of Radiology Dr. Kazerooni to work remotely (given that other radiologists were working remotely at the time) until some of these issues could be resolved.

208. Dr. Kazerooni refused Dr. Petrou's request.

209. UM Lead Counsel Timothy Lynch threatened Dr. Petrou instructing her to return to an unsafe and hostile work environment.

210. Dr. Petrou sent her resignation letter to Dr. Kazerooni on September 24, 2018 effective September 30, 2018.

211. Dr. Kazerooni accepted the resignation without asking Dr. Petrou any questions or offering counseling.

212. Instead Dr. Kazerooni referred the resignation to the University of Michigan Police as "suspicious circumstances" without informing Dr. Petrou.

213. The University of Michigan Police kept the investigation open for months but never talked to Dr. Petrou, Dr. Foerster or Paul Cronin.

214. The University of Michigan Police claimed that they tried to get hold of Dr. Petrou through an old phone number, even though Dr. Petrou's correct, updated phone number was on record with the University of Michigan.

215. The University of Michigan Police had previously ignored reports of death threats against Dr. Petrou and Ms. Altaee and closed the investigation into those within just over an hour while mis-documenting the facts.

216. Following the resignation of Dr. Petrou, OIE issued an Assessment of Claims for Dr. Petrou's concerns over "Nick" stating they could not investigate as they could not determine the identity of "Nick" and documenting that Paul Cronin would not cooperate with the investigation despite being contacted 18 times.

217. Just as with Ms. Altaee's OIE report, OIE did not release a copy of the report to Dr. Petrou.

218. Instead, Mr. Tukel brought out both Ms. Altaee's and Dr. Petrou's OIE reports during the Dr. Foerster's 5.09 proceedings.

219. Following the resignation of Dr. Petrou from the University of Michigan, Paul Cronin sent Dr. Petrou an affidavit stating that all of "Nick's" sexual allegations were fabricated.

220. Following the resignations of Dr. Petrou and Dr. Foerster from the University of Michigan, Dr. Petrou and Dr. Foerster found out that there was an FBI report marked "Do Not Distribute" at the University of Michigan from January/February 2018 documenting allegations of mental instability regarding Dr. Petrou and Dr. Foerster by Dr. Petrou's mother Maria Petrou and Dr. Petrou's late father Petros Petrou who was demented at the time.

221. Maria Petrou has stated that she never made claims of mental instability against Drs. Petrou and Foerster and has executed a recent affidavit to that effect.

222. The University of Michigan has refused to disclose how it came into possession of the FBI report.

223. Maria Petrou has stated that she was never given a copy of the FBI report prior to obtaining a copy via the office of attorney Papantoniou in Nicosia, Cyprus, where Dr. Petrou deposited the report released to her by the University of Michigan FOIA Office.

224. Following her resignation in good standing from the University of Michigan, Dr. Ella Kazerooni, the University of Michigan and affiliates and surrogates have gone on to blacklist Dr. Petrou and Dr. Foerster from academic and private practice positions and to actively interfere in numerous and sinister ways with her employment and right to life, liberty and happiness.

225. Dr. Petrou has also applied for the same position she held in the Department of Radiology, Division of Neuroradiology prior to being approved for tenure and was not even granted an interview.

226. Dr. Petrou's qualifications are superior to the faculty hired for (non-tenured) the position when Dr. Petrou's qualifications were vetted for tenure.

227. When inquiring with current Department of Radiology Chair Dr. Vikas Gulani, Dr. Gulani stated that this decision is up to division chief Dr. Ashok Srinivasan.

228. Dr. Srinivasan and his wife have a close relationship with Dr. Ella Kazerooni.

229. Instead, Paul Cronin and Aine Kelly were promoted out to Emory University as full professors in the Department of Radiology.

230. Dr. Ella Kazerooni has previously admitted defaming Dr. Petrou and specifically disseminating defamatory articles published by the Ann Arbor Observer nationally and internationally which has interfered with employment and other opportunities for Dr. Petrou and her husband Dr. Foerster.

231. Ashok Srinivasan's wife Prachi Agarwal is currently the Division Chief for Cardiothoracic Radiology at the University of Michigan and was a faculty member under Dr. Kazerooni in the Cardiothoracic Radiology Division when the "Nick" fiasco erupted.

232. The University of Michigan has been constructively denying a FOIA request of recordings between Ashok Srinivasan and "Nick".

233. In meetings between Dr. Petrou and Drs. Srinivasan and Dunnick as well as Drs. Srinivasan and Kazerooni, Drs. Srinivasan, Dunnick, Kazerooni and administrator Dana

Habers as well as then Dean of Faculty Affairs Margaret Gyetko all denied knowing anything about "Nick."

234. Dr. Kazerooni and Dr. Srinivasan in a meeting with Dr. Foerster denied knowing anything about "Nick."

235. In August 2018, upon Dr. Foerster's first day of returning to work full-time, Dr. Foerster was ambushed by Medical School Dean Dr. Carol Bradford and Dr. Kazerooni and handed a letter informing him that the University of Michigan was initiating 5.09 dismissal proceedings against Dr. Foerster.

236. Dean Runge's August 6, 2018 letter documented that the University of Michigan had transferred NIH R01 Grant NS082304 to the University of Utah.

237. Once again, Dr. Foerster had implored the University of Michigan not transfer and keep the NIH R01 Grant as the grant was essential to the "Hope" of the UM ALS patients.

238. Dean Runge's letter documented that "The University of Michigan is no longer willing to allow you to serve in a Principal Investigator or Co-Investigator role on new grants submitted to the NIH, pending the outcome of the formal Office of Inspector General investigation into the matter."

239. As documented in this complaint, the OIG investigation cited by Dr. Runge was administratively closed in October, 2017.

240. Dr. Foerster was escorted off by security and banned from the medical campus without justification and without the appropriate documentation by the UM Department of Public Safety/law enforcement.

241. Upon information and belief, this was part of the University's scheme to prevent the renewal of the HHS-OIG investigation into NIH R01 Grant NS082304.

242. The University of Michigan retained outside attorney Daniel Tukel (Butzel Long law firm) to represent Medical School Dean Runge to prosecute the case against Dr. Foerster.

243. Dr. Foerster represented himself through the duration of the 5.09 proceedings.

244. The University of Michigan ByLaw's precluded the hiring of an outside attorney to represent Dean Runge.

245. Following the conclusion of the 5.09 proceedings, the University of Michigan amended its ByLaws to allow for an outside attorney to represent the University.

246. In the Charge Letter,  Dean Runge used the fabricated AWOL charge from the VA to justify Dr. Foerster's dismissal proceedings.

247. In the Charge Letter,   Dean Runge falsely accused Dr. Foerster of not properly administering the NIH R01 grant based on a sham unsigned investigation by Hall Render even though Dr. Foerster nursed the grant back to health after the obstruction by Dr. Welsh.

248. Specifically, Dean Runge falsely accused Dr. Foerster of improper supervision of Ms. Altaee  and approval of time sheets even though Dr. Feldman had been Ms. Altaee's supervisor since summer 2016 and Dr. Feldman was signing off on Ms. Altaee's time sheets in question.

249. Specifically, Dean Runge falsely accused Dr. Foerster of an improper lapse of the IRB for the NIH R01 grant even though Dr. Foerster was on approved family leave, Ms. Altaee had documented IT issues and was unable to access the IRB renewal portal, and subsequent to submitting the IRB renewal and receiving confirmation being informed by the IRB (Ann Dillon) as well as Radiology Lead Research Coordinator Tami Harper who

was in overall charge of the radiology IRBs (including the NIH R01 grant IRB) that IRB renewal submissions are not infrequently submitted late and not to worry about it.

250. Specifically Dean Runge falsely accused Dr. Foerster of significant deficiencies accord to an Office of Research Compliance Review (ORCR).

251. This was the second audit performed on the grant in six months by the same person, Dr. Sana Shakour.

252. The first audit was triggered by false allegations by former research coordinator Sara Abraham who alleged that Dr. Foerster had committed data fraud on NIH R01 Grant NS082304 and that there were missing files.

253. Dr. Shakour issued a final report for the second audit even though Dr. Foerster informed Dr. Shakour that he was on approved medical leave and could not participate in the investigation.

254. Dr. Shakour and Deputy Lead Counsel Morgenstern informed Dr. Foerster that there were missing files for the NIH grant.

255. Dr. Foerster informed both Dr. Shakour and Deputy Lead Counsel Morgenstern that prior to leaving on approved family/medical leave in summer 2017 all the research files for the NIH grant were accounted for.

256. Deputy Lead Counsel Morgenstern refused to investigate who else had access to Dr. Foerster's office where the files were located.

257. Following, Dr. Foerster discovered that Deputy Lead Counsel Morgenstern had sequestered the research files without informing Dr. Foerster.

258. Concurrently, Deputy Lead Counsel Morgenstern solicited over 20+ pieces of evidence from Dr. Foerster for a NIH investigation regarding Dr. Welsh's work effort on NIH R01 Grant NS082034.

259. Deputy Lead Counsel Morgenstern informed Dr. Foerster that she was liaising with the NIH regarding the matter and would forward the 20+ pieces of evidence to the NIH.

260. Per NIH FOIA Office, there is no record any communication by Deputy Lead Counsel Morgenstern/the University of Michigan regarding the NIH grant or the 20+ pieces of evidence submitted by Dr. Foerster.

261. In the Charge Letter,  Dean Runge falsely accused Dr. Foerster of making false allegations even though there was documentary evidence that Dr. Welsh had no documented any data analysis to the NIH despite taking >$100K.

262. In the Charge Letter,  Dean Runge falsely accused Dr. Foerster of making false allegations regarding the radiology billing even Dr. Foerster had been informed by two separate colleagues of the concerns and both colleagues informing Dr. Foerster that they had evidence.

263. Paul Cronin and Aine Kelly had both falsely informed Hall Render that Dr. Foerster was the source of the radiology billing concerns.

264. Hall Render ran a sham investigation of the radiology billing concerns with Dr. Ella Kazerooni, who was named in the complaint, assigned to conduct the internal investigation, a direct conflict of interest.

265. In the Charge Letter,  Dean Runge falsely accused Dr. Foerster of disseminating mass emails and personal recordings via email.

266. In the Charge Letter,  Dean Runge falsely accused Dr. Foerster of improper conduct in the judicial system even though Dr. Foerster followed his attorney Cyril Hall's advice.

267. On November 17, 2018, Dr. Foerster wrote the University of Michigan and asked UM to facilitate the release of the Cronin recordings that were in Ms. Altaee's possession given the national security implications and the concerns of personal safety for the witnesses as well as the young children.

268. Ms. Altaee recorded a number Cronin conversations in 2016-2017 as the scene seemed too bizarre.  Dr. Petrou asked Ms. Altaee to keep the recordings as Dr. Petrou was concerned that the recordings were too inflammatory and she did not want them in Dr. Petrou's or Dr. Foerster's possession or anywhere close to their children.

269. Ms. Altaee said that she would keep the recordings and ensure the recordings were safely stored in case they were ever needed.

270. The University of Michigan ignored Dr. Foerster's request to facilitate the recordings.

271. Instead, Mr. Tukel doubled-down on prosecuting Dr. Foerster's dismissal.

272. There were three Ad-Hoc Medical School Committee 5.09 hearings which occurred in November-December 2018.

273. The first hearing occurred days after Gretchen Whitmer was elected Governor of the State of Michigan.

274. Dr. Foerster brought forward attorney Cyril Hall as a witness.

275. Once again, Cyril Hall did not represent Dr. Foerster at any time during the 5.09 proceedings.

276. Cyril Hall testified that statutory construction precluded the University of Michigan from using civil litigation against Dr. Foerster.

277. Cyril Hall testified that the University of Michigan had to explicitly inform staff and faculty in its rules and regulations if it wanted to be able to use the outcomes of civil litigation against employment status.

278. Cyril Hall also documented to the Medical School Ad-Hoc Committee that Dr. Foerster had no choice but to file litigation given that there was no probable cause file for the search warrants freezing the bank accounts.

279. The University of Michigan only brought four witnesses to testify, none of which had direct knowledge of the charges against Dr. Foerster.

280. UM brought attorney David French from Hall Render who defended the fact that the Hall Render reports regarding NIH R01 grant NS082304 and the radiology billing concerns were unsigned draft reports.

281. Dr. Foerster had repeatedly requested a copy of the Hall Render reports for nearly a year since December 2017.

282. Dr. Foerster was only provided a copy of the unsigned draft Hall Render reports by Mr. Tukel, less than two weeks before the first Medical School Ad-Hoc Committee 5.09 meeting.

283. Mr. Tukel also repeatedly refused to provide Dr. Foerster with any of the other evidence prior to the Medical School Ad-Hoc Committee 5.09 meetings.

284. David French admitted that Dr. Welsh documented no data analysis for the NIH annual reports.

285. David French stated under oath that Dr. Welsh was interviewed.

286. Later, Dr. Foerster discovered that in contradistinction to Dr. Foerster's and Dr. Petrou's interviews, there were no transcripts for either Dr. Welsh's or Dr. Kazerooni's interviews by Hall Render.

287. UM brought forward Michigan Medicine Chief Information Officer Jack Kufahl who admitted that he was unsure if he could track an IP address given Dr. Foerster's statements that he did not send the mass emails or disseminate his personal recordings.

288. UM brought forward Dean Dr. Ray Hutchinson who admitted that the purpose of the spring 2016 cease and desist letter sent by Dr. Welsh to Dr. Foerster was to gag Dr. Foerster from discussing the sexual harassment case at the arbitration meeting.

289. Dr. Hutchison was a personal friend of Dr. Welsh.

290. UM was using the fact that Dr. Foerster did not participate in the arbitration meeting regarding the NIH grant subcontract against Dr. Foerster.

291. With the knowledge of Dean Hutchinson and the UM OGC, Dr. Welsh had refused to retract the cease and desist letter.

292. As such, Dr. Foerster was unable to participate in the arbitration meeting due to concerns of obstruction of justice.

293. Later, Dr. Foerster found out there were no minutes of the November, 2016 arbitration committee meeting which awarded the subcontract to Dr. Welsh.

294. It is against University of Michigan policy to conduct a formal meeting regarding a federal grant without keeping minutes.

295. In Spring 2017 after Dr. Foerster informed the University of Michigan that Dr. Welsh had not documented any analysis in the annual reports to the NIH, Dr. Welsh falsely

claimed that Dr. Foerster had obstructed his access to the data from the grant in an effort to exonerate himself.

296. The arbitration committee allegedly met for a second time.

297. Once again, there are no minutes for the second arbitration committee meeting.

298. After Dr. Foerster explained to Dr. Hutchinson that he had not obstructed data analysis to Dr. Welsh, Dr. Hutchinson told Dr. Foerster that Dr. Foerster "had been very reasonable" and that Dr. Hutchinson would follow-up if he had any concerns.

299. Dr. Hutchinson never followed up with Dr. Foerster.

300. As the last of four witnesses, UM brought forward AAPD Detective Geoffrey Spickard.

301. AAPD Detective Spickard testified that cat ownership was a "criminal" matter and warranted a "criminal investigation."

302. The day after the Washtenaw County Prosecutor declined to press charges against Dr. Foerster and Dr. Petrou (on February 7, 2018), the AAPD opened a criminal investigation against Dr. Foerster and Dr. Petrou for adopting two stray orange cats, along with Maria Eva Foerster and Peter Martin Foerster the previous summer.

303. The AAPD never informed Dr. Foerster or Dr. Petrou that a formal criminal investigation was opened; Dr. Foerster discovered the criminal investigation through FOIA.

304. Stacy Markel who was a neighbor reported the two orange cats as hers even though the orange cats where starving when adopted by Dr. Foerster and Dr. Petrou and Maria and Peter Foerster and no one in the neighborhood claimed the cats when Dr. Foerster and Dr. Petrou inquired in summer of 2017.

305. Stacy Markel is affiliated with and has made donations to the University of Michigan.

306. Prior AAPD Officer Boylan had interviewed Dr. Foerster about the cats and informed Dr. Foerster that cat ownership was a civil issue.

307. The Washtenaw County Sheriff's office also concurred with AAPD Officer Boylan that cat ownership was a civil issue.

308. Attorney Cyril Hall settled the civil litigation in the 15th District Court with Chief Judge Joseph Burke presiding.

309. Paul Cronin was responsible for giving the two orange cats to the Markels through attorney Cyril Hall's office.

310. In spite of Chief Judge Burke stating that the ownership could only be proven through microchip scanning, the two orange cats given to the Stacy Markel were never scanned.

311. Following the settling of the case with the Markels, Judge Burke prosecuted contempt of court proceedings against Dr. Foerster and Dr. Petrou committing numerous procedural court violations to do so.

312. Among other violations, Judge Burke never signed his order and conducted the hearing on a closed case.

313. In spite of this, the University of Michigan and Mr. Tukel used Judge Burke's flawed court proceedings against Dr. Foerster during the 5.09 proceedings.

314. University of Michigan and Mr. Tukel also used Federal Judge Sean Cox's show cause hearing decision taken out of context during the 5.09 proceedings against Dr. Foerster's employment.

315. The Judge Sean Cox show cause hearing was conducted on a closed case.

316. Following, Dr. Foerster discovered that UM Deputy Lead Counsel Kara Morgenstern filed a complaint to LARA against Dr. Foerster and Dr. Petrou using Judge Burke's flawed court proceedings.

317. During the 5.09 proceedings, Mr. Tukel played Dr. Foerster's personal recordings between Dr. Foerster and Dr. Feldman and Dr. Foerster and Dr. Cohan without Dr. Foerster's permission.

318. Mr. Tukel would not disclose how the source of Dr. Foerster's personal recordings.

319. Paul Cronin initially agreed to testify at the 5.09 proceedings but then backed out.

320. Dr. Foerster was not allowed to compel witnesses to testify who had first-hand knowledge of the charges against Dr. Foerster even though UM Lead Counsel Timothy Lynch had previously informed Dr. Foerster that the University could compel UM employees to cooperate with an investigation.

321. The University of Michigan also refused Dr. Foerster's request to serve interrogatories for the 5.09 proceedings.

322. As a result, in its December 19, 2018 decision memorandum, the Ad-Hoc Medical School 5.09 Committee depended on hearsay evidence to make its recommendation to dismiss Dr. Foerster all the while ignoring Dr. Foerster's 150+ pieces of unrefuted evidence.

323. In its decision memorandum, the Ad-Hoc Medical School 5.09 Committee fabricated new allegations against Dr. Foerster including "failure to properly oversee a Department of Veterans Affair (VA) Merit Award budget", "incorrect and misleading characterization of the evidence", and "failure to take responsibility for his actions."

324. In his rebuttal and appeal to the Ad-Hoc Medical School 5.09 Committee decision memorandum, Dr. Foerster documented the numerous violations of the University's own

ByLaws, the U.S. Constitution, the American Disability Act, the Family Leave Medical Act and Due Process both prior and during the 5.09 proceedings.

325. In April 2019, Drs. Foerster and Petrou discovered that the HHS-OIG had no employment record of a "Tyson Howard."

326. Subsequently, Dr. Foerster asked Mr. Tukel, the University of Michigan including the SACUA, and Deputy Lead Counsel Kara Morgenstern to investigate as it had vetted Agent Howard to question Paul Cronin.

327. UM including Deputy Lead Counsel Kara Morgenstern refused to investigate the identity of "Tyson Howard."

328. Despite Agent Howard requesting that Dr. Foerster follow-up, Agent Howard never replied to over 20 emails documenting the concerns regarding NIH R01 Grant NS082304.

329. Dr. Foerster also followed up with FBI Special Agent Sue Lucas regarding "Tyson Howard's" status but never received a reply.

330. The HHS-OIG has recently confirmed there is no record of the March 2, 2018 interview.

331. In the FBI FOIA release of the March 2, 2018 the FBI has redacted the name of the HHS-OIG agent who interview Dr. Foerster and Dr. Petrou, a violation of the FOIA.

332. To date, no one has been able to find HHS-OIG Special Agent Tyson Howard.

333. University of Michigan Lead Counsel Timothy Lynch also refused to investigate the identity of "Tyson Howard" even though the University of Michigan vetted Special Agent Tyson Howard as per Paul Cronin and Aine Kelly, Dr. Kazerooni brought in Special Agent Tyson Howard to interview Paul Cronin in the Radiology Chair's conference room shortly after the March 2, 2018 interview.

334. University of Michigan Lead Counsel Timothy Lynch also approved the illegal garnishment (exceeding $10K) of Dr. Foerster's and Dr. Petrou's salaries using State of Michigan court orders even though Dr. Petrou and Dr. Foerster were residents of California at the time as documented in the University of Michigan paystubs.

335. Mr. Lynch's justification for this illegal activity was that he/The University of Michigan "does not flout court orders."

336. In April 2019, just prior to the SACUA review hearing, a complaint was made to the UM police falsely stating that "Foerster has lost touch with reality and is suffering from mental instability."

337. Maria Foerster, Dr. Foerster and the family were in Ann Arbor visiting Maria Foerster's grandparents, attended church for Greek Easter and had Easter lunch with family and friends with no concerns.

338. The University of Michigan Police never contacted Dr. Foerster.

339. Dr. Foerster discovered the complaint through a FOIA request.

340. The University of Michigan has refused to release the identity of the witness who made the false allegations in the April 19, 2019 police complaint.

341. Instead, the University of Michigan police officer recommended extra patrols based on the false witness.

342. On May 1, 2019 the University of Michigan SACUA conducted a review hearing for the 5.09 proceedings.

343. Once again, Mr. Tukel represented Dean Runge, a violation of the 5.09 ByLaws in existence at the time.

344. Attorneys Angela Jackson and Bruce Wallace (Hooper Hathaway law firm) provided legal counsel to the SACUA, a violation of the 5.09 ByLaws in existence at the time.

345. After Mr. Tukel spent nearly one quarter of his time and efforts attacking Dr. Foerster's character over the fabricated VA AWOL charge/termination, the SACUA dismissed the VA concerns from the 5.09 proceedings as grounds for termination.

346. On May 24, 2019 The SACUA Review Committee recommended the dismissal of Dr. Foerster.

347. The SACUA Review Committee went on to recommend that the civil litigation not be used in the 5.09 proceedings stating, "First and foremost, Dr. Foerster's legal battles on subjects unrelated to the University should irrelevant to the serious process of dismissing a tenured faculty member. Second, as previously discussed, reliance on Dr. Foerster's behavior civil litigation undermines the choice of procedures available applicable on to 'matters concerning primarily the medical school.'"

348. In its decision memorandum, the SACUA Review Committee dismissed the ByLaw violations as reported by Dr. Foerster (including that Mr. Tukel was not allowed to represent Dean Runge), stating that the Medical School Ad-Hoc Committee "observed the procedure prescribed in Regent's ByLaw 5.09 (4)."

349. In its decision memorandum, the SACUA Review Committee ignored the U.S. Constitutional violations and violations of the American Disability Act, the Family Medical Leave Act, and Due Process and alleged that the Medical School Ad-Hoc Committee "accorded Dr. Foerster a fair hearing."

350. In its decision memorandum, the SACUA Review Committee referenced numerous pieces of the University of Michigan's hearsay evidence all the while ignoring the 200+ pieces of evidence presented by Dr. Foerster.

351. In contradistinction to the Medical School Ad-Hoc Committee which ignored the sexual harassment case altogether even though it was the lightening rod, the SACUA Review Committee weaponized the sexual harassment case against Dr. Foerster falsely stating that "Dr. Foerster's defense to the dismissal is largely based on an argument that his effort to help a colleague lodge a sexual harassment a co-investigator on their R01 grant triggered a complex, conspiratorial, and targeted retaliation campaign against him by unidentified individuals."

352. In echoes of the Salem Witch trials, the SACUA Review Committee supported the Medical School Ad-Hoc Committee's finding that Dr. Foerster's termination was justified because Dr. Foerster would not take responsibility for actions that Dr. Foerster did not commit.

353. In a further effort to discredit Dr. Foerster and in echoes of the psychiatric sting operation, the SACUA Review Committee falsely documented in its conclusion paragraph, "Dr. Foerster's sudden decline in seemingly irrational conduct" and "they [Dr. Foerster's acts and omissions] have been equally and incomprehensibly self-destructive."

354. In his May 31, 2019 rebuttal and appeal of the SACUA Review Committee's report and recommendation to President Schlissel, Dr. Foerster documented the numerous violations of the University's own ByLaws, the U.S. Constitution, the American Disability Act, the Family Leave Medical Act and Due Process both prior and during the

5.09 proceedings which occurred during both the Medical School Ad-Hoc Committee and the SACUA Review Hearing.

355. After discovering another SACUA hearing regarding dismissal of a UM faculty in which the faculty member was treated completely differently, Dr. Foerster wrote President Schlissel a letter on June 9, 2019 that the Medical School Ad-Hoc Committee and the SACUA Review Hearing Committee were being conducted/misconducted with the intent of a predetermined outcome.

356. Dr. Foerster documented to President Schlissel, "Once again the discrepancies regarding how the SACUA Faculty Hearing Committee approached and ruled on Dr. Borisov's case and how the SACUA Review Committee approached and ruled on my case are irreconcilable. The only explanation that I can provide is that I am being targeted in fact being retaliated against for reporting protected activity (both in terms of the sexual harassment case involving the NIH R01 research coordinator as well as my concerns regarding EPIC) which was admonished by the SACUA in 2009-2010 but not being condoned and propagated by the same governing body of the University."

357. In her May 31, 2019 letter to President Schlissel, Chair of the SACUA Dr. Joy Beatty stated that "SACUA considers that the dismissal process as prescribed in Regents' ByLaw 5.09 has been properly followed, and that Dr. Foerster was treated fairly and in accordance with the rules."

358. In the letter, SACUA Chair Dr. Joy Beatty recommended "immediate termination of Dr. Foerster."

359. In his June 10, 2019 letter to President Schlissel, Dean Runge re-upped his false allegations against Dr. Foerster using the findings of the Medical School Ad-Hoc Committee and the SACUA Review Hearing Committee to rubberstamp his charges.

360. Dean Runge disagreed with the SACUA Review Hearing Committee regarding the civil litigation issue and argued that civil litigation could be used against Dr. Foerster's employment.

361. In his June 17, 2019 memorandum, President Schlissel agreed with Dean Runge in resurrecting the civil litigation issue and used it as a basis to recommend Dr. Foerster's dismissal.

362. Upon information and belief, President Schlissel resurrected the civil litigation issue so that it could be used against Dr. Foerster's wife, Dr. Myria Petrou (also party to the same litigation) down the road if needed.

363. In his June 17, 2019 memorandum, President Schlissel stated that "I am satisfied that the process provided in ByLaw 5.09(4) was followed."

364. President Schlissel ignored Dr. Foerster's May 31, 2019 rebuttal and follow-up June 9, 2019 letter using the excuse that "I have reviewed the comments that Dr. Foerster made regarding his concerns with the dismissal process. His arguments were similar in nature to the arguments he made to the Review Committee, arguments that committee concluded were either not credible or were insufficient to warrant a different recommendation."

365. The Medical School Ad-Hoc Committee, the SACUA Review Hearing Committee, Dean Runge, and President Schlissel used the fact that Dr. Foerster denied sending the mass emails to render Dr. Foerster as non-credible and dismiss Dr. Foerster's evidence.

366. After the 5.09 proceedings were concluded, the University of Michigan reluctantly released the IP addresses for the emails confirming that Dr. Foerster did not send the mass emails.

367. Through a FOIA request, it was revealed that Dr. Welsh's attorney had disseminated the mass emails.

368. President Schlissel, a physician himself, refused Dr. Foerster's request for a short term extension for his reply/rebuttal to President Schlissel's June 17, 2019 memorandum in spite of Dr. Foerster providing Dr. Schlissel with documentation of an acute medical disability from Dr. Foerster's physician.

369. As a result, on June 23, 2019, Dr. Foerster resigned in good standing from the University of Michigan due to a hostile work environment.

370. Following, Dr. Foerster wrote the University of Michigan Regents and Governor Gretchen Whitmer as Governor Whitmer directly oversees the University of Michigan as there is no intervening state board documenting some of the constitutional violations practiced by the University of Michigan against Dr. Foerster.

371. The University of Michigan Regents never replied to Dr. Foerster's concerns.

372. Governor Whitmer never replied to Dr. Foerster's concerns.

373. In addition, UM has repeatedly constructively denied FOIA requests from Drs. Foerster and Petrou involving documents including but not limited to secret investigations instigated by false witnesses (e.g. "Nick", Sara Abraham), medical licensure/credentialing involving Paul Cronin and his wife Aine Kelly (also employed as a radiologists at UM), and marriage documents/certificates.

374. University of Michigan has reluctantly only released numerous FOIA requests related to Dr. Foerster and Dr. Petrou's employment including but limited to secret investigations instigated by false witnesses (e.g. "Nick", Sara Abraham) after litigated FOIA appeals.

375. To date, the University of Michigan has refused to disclose whether it not has any recordings of Paul Cronin regarding his statements of the 2016 U.S. Presidential Election despite a litigated FOIA appeal.

376. To date, the University of Michigan has refused to disclose whether it not has any recordings of "Nick" despite a litigated FOIA appeal.

377. Further, Ms. Altaee received death threats related to these matters as Mr. Lynch is aware.

378. The first death threat was in January 2018 around the time that Drs. Foerster and Petrou wrote Special Counsel Mueller.

379. The UM police mis-documented the facts of the January 2018 death threat and closed the case just after an hour of receiving the complaint.

380. In addition, Plaintiff Maria Foerster's parents, Dr. Foerster and Dr. Petrou, have been repeatedly denied interviews and job positions for which they are clearly qualified.

381. The most recent employment denial is a neuroradiology faculty position at University of California-Irvine.

382. Dr. Foerster was offered this same faculty position at University of California-Irvine in 2016.

383. In 2016, Dr. Foerster was advised by then Radiology Chair Dr. Reed Dunnick and long-term mentor Dr. Eva Feldman not to take the position at University of California Irvine as there would be better opportunities at the University of Michigan.

384.  Prior in 2015 when Dr. Foerster was being recruited for neuroradiology division director at Northwestern University, Dr. Dunnick, Dr. Feldman and others advised Dr. Foerster not to take the position as there would be better opportunities at the University of Michigan.

385.  In fact, University of Michigan Professor Dr. David Pinsky who is a colleague of Dean Runge as they are both in the Division of Cardiology informed Dr. Foerster that Dr. Foerster "was exactly the type of faculty that Dean Runge wanted to retain and promote."

386.  EEOC Deputy Director Alan Anderson informed Dr. Foerster and Dr. Petrou that there "is no doubt that you are being blackballed by the University of Michigan."

387.  Dr. Petrou recently received a memo through HHS-OIG FOIA dated August 21, 2019 that documenting, "Discussions with the Office of the United States Attorney resulted in a declination of the criminal prosecution.  The criminal case is therefore closed."

388.  Given the timing of the August 21, 2019 memo and upon information and belief, the criminal case regarding NIH R01 Grant NS082304 was closed given that Duaa Altaee, Dr. Myria Petrou and Dr. Bradley Foerster no longer worked for the University of Michigan.

389.  In fact, the University of Michigan has repeatedly refused to reach a non-financial agreement with Dr. Foerster or Dr. Petrou to allow Plaintiff Maria Foerster to pursue careers, life, liberty and happiness for the family.

390.  In fact, the University of Michigan has and continues to interfere with the ability of Drs. Foerster and Petrou to obtain employment in states where Plaintiff's family would have greater social support, such as in the State of Michigan.

391. The University of Michigan has repeatedly refused to come to a settlement to allow Dr. Petrou  and Dr. Foerster to work unimpeded which the University of Michigan's own counsel Daniel Tukel has said in front of a federal judge was an unreasonable position on the part of the University of Michigan.

392. Concurrently in July 2019, Mr. Tukel informed the federal judge that if the University had any outstanding law enforcement documents Dr. Petrou should have access to them.

393. When periodically, physical safety concerns have emerged in the context of the events outlined above, University of Michigan Lead Counsel Timothy Lynch has repeatedly refused to take any initiative or responsibility and instead referred Dr. Petrou to law enforcement when clearly law enforcement has been weaponized in this scheme to discredit and target Dr. Petrou and Dr. Foerster.

394. As recently as on September 26 2021, Dr. Petrou and Dr. Foerster, in an attempt to reach reconciliation and settlement wrote to the University of Michigan Regents and outlined the issues with her resignation under fraudulent pretenses, Paul Cronin's bizarre statements, the mishandling of Dr. Petrou's resignation by Dr. Kazerooni referring the matter to law enforcement and blacklisting Dr. Petrou, the victim in the entire situation while "wishing Dr. Petrou well in her future endeavors" and asked the UM Regents to consider these matters as they direct a path forward.

395. In fact, the University of Michigan has refused to engage in any productive discussion to settle outstanding issues with Maria Foerster's family, attempting to falsely brand communication with University personnel about very concrete issues as  "harassment" with no basis.

396. Furthermore, almost everyone who has offered any meaningful assistance to Maria Foerster's family through this journey has faced significant and often sinister adverse action against their employment, family and general well-being.

397. In addition, Plaintiff Maria Foerster's parents have faced severe and pervasive interference with their employment which they have only able to obtain after placing the University of Michigan on record which continues to date and includes sinister schemes interfering with patient care.

398. In fact, not only will the University not engage in any meaningful discussion to settle outstanding issues, the University has engaged in a pattern of obstruction of timely FOIA requests that Dr. Foerster and Dr. Petrou have had to file to protect Plaintiff Maria Foerster, their employment and basic rights of their family.

399. As part of the overall scheme to discredit and target Maria Foerster's family, the University of Michigan has committed numerous violations of the FOIA as documented in the numerous litigated FOIA appeals that Drs. Foerster and Petrou were forced to file with the Court of Claims in Michigan to obtain critical information to protect their employment.

400. Further, Maria Foerster's parents have repeatedly contacted Dr. Eva Feldman to help Maria Foerster and facilitate a settlement.

401. Dr. Eva Feldman has repeatedly not responded directly to these requests.

402. Instead, Dr. Feldman has used attorneys/UM Office of General Counsel to issue threats against Maria Foerster's family and parents.

403. Further, Plaintiff Maria Foerster is not able to see, meet or publicly interact with her friend Ms. Duaa Altaee due to the threat of additional false criminal allegations against herself and her family.

404. Upon information and belief, if Plaintiff Maria Foerster and/or her family were to meet/spend time with Ms. Duaa Altaee, then the Defendants and/or proxies for the Defendants (such as "Nick", Paul Cronin, Aine Kelly, Alison Cronin, etc.) would emerge with additional false allegations against Plaintiff Maria's family and/or Duaa Altaee in an effort to deflect/cover-up for their wrong-doing/illegal acts/activities.

405. In summary, Plaintiff Maria Foerster has been effectively rendered a refugee in her own country with her parents' employment constantly being undermined and threatened by the Defendants and/or their agents affiliated with the University of Michigan resulting in numerous relocations for herself and her family.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Violation of Constitutional and Civil Rights*
*Under 42 U.S.C. § 1983*

406. Plaintiff Maria Foerster realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

407. When the events alleged in this complaint occurred, Defendants President Mark Schlissel,  Dean Marschall Runge, Dr. Reed Dunnick, Dr. Eva Feldman, Dr. Ella Kazerooni, Dr. Ashok Srinivasan, Lead Counsel Timothy Lynch, and Deputy Lead Counsel Kara Morgenstern were acting within the scope of their employment at the University of Michigan.

408. At all times relevant, the Defendants and/or their agents oversaw the University of Michigan Police and are liable for their acts.

409. Defendants also liable because of their policies, practices, and customs, which lead to this complaint of violation of 42 U.S.C. § 1983.

410. Plaintiff Maria Foerster's constitutional protected rights that Defendants violated include, but are not limited to the following:

    a)    The right to seek judicial redress in the courts pursuant to the First Amendment to the U.S. Constitution;

    b)    The rights against taking of property without due process pursuant to Takings Clause of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

    c)    The right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

    d)    The right to due process protected by the Fifth and Fourteenth Amendment to the U.S. Constitution;

    e)    The right to confront one's accusers protected by the Sixth Amendment;

    f)    The right to privacy, protected by the Ninth Amendment to the U.S. Constitution;

    g)    The right to free speech and gather, protected by the First Amendment of the U.S. Constitution; and

    h)    The right to life, liberty and happiness.

411. The Defendants and/or their agents under the color of law, violated these longstanding constitutional rights of Plaintiff Maria Foerster and her family by running numerous secret police investigations against Plaintiff Maria Foerster's family.

412. Defendants and/or their agents endorsed and furthered false allegations against Plaintiff Maria Foerster's family who had documented financial and other incentives to pursue such false allegations without documenting or investigating conflicts of interest.

413. Defendants ignored and obfuscated requests of investigation by Plaintiff Maria Foerster's family including Dr. Foerster and Dr. Petrou which did not serve the agenda of malignant prosecution against Plaintiff Maria Foerster's family and which would compromise and incriminate the false witnesses that the Defendants and/or their agents employed to further an agenda of malignant prosecution.

414. The right to due process was violated by the Defendants and/or their agents violating court rules and state statutes under the direct watch of the Defendants.

415. The right to fair and equal treatment was violated by the Defendants and/or their agents who displayed bias towards Plaintiff's family and favored other parties with no justification.

416. The right to confront one's accusers were violated by not allowing Plaintiff Maria Foerster's father, Dr. Foerster, to cross-examine critical witnesses in the 5.09 proceedings.

417. The right to confront one's accusers were violated by not allowing Plaintiff's mother Dr. Petrou to confront "Nick" or Paul Cronin in the setting of an official University investigation.

418. The right to privacy and right to free speech was violated by the Defendants and/or their agents obtaining Plaintiff Maria Foerster's father's personal recordings without a search warrant and then using these personal recordings against Dr. Foerster and Maria Foerster's family.

419. The right to life, liberty and happiness was violated by the Defendants and/or their agents approving and running numerous sham investigations against Plaintiff Maria Foerster's family which suffered from multiple violations of Due Process and inconsistencies.

420. The right to life, liberty and happiness was violated by the University of Michigan through destroying Plaintiff's parents right to use their extensive training and abilities to pursue an academic career including taking care of patients in an academic setting, teach students, and pursue research advances to treat fatal neurological diseases. This directly infringed upon the family's well-being and opportunities for Maria Eva Foerster herself.

421. The right to life, liberty and happiness was violated by the Defendants and/or their agents through destroying Plaintiff Maria Foerster's reputation and her numerous close personal relationships and her close friends which had been fostered over numerous years.

422. The right to life, liberty and happiness was violated by the Defendants and/or their agents by forcing repeated relocations of Plaintiff thereby disrupting Plaintiff's education and depriving Plaintiff of extracurricular activities and detrimentally affecting her long-term high school and college career/trajectory.

423. Plaintiff and her family were also deprived of travel and extracurricular educational opportunities due the financial hardship propagated against Plaintiff and her family by the Defendants.

424. Plaintiff and her family were also deprived of religious and cultural rights as there are no vibrant Greek communities/churches in Cedar Falls, Iowa.

425. Further, the loss of Plaintiff Maria Foerster's house and eviction from the house was directly caused and condoned by the Defendants and/or their agents through the facilitation and subsequent cover-up of "Nick" resulting in the taking of property without

due process.  Plaintiff Maria Foerster's house was subsequently purchased by prominent University of Michigan faculty, Professor Betsey Stevenson, a former Obama cabinet member and advisor to Joe Biden.

426. The acts Defendants and/or their agents were not privileged.

427. Defendants and/or their agents, acting under color of law, authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as the Plaintiff.

428. Defendants' faculty Paul Cronin and Aine Kelly also violated Plaintiff's rights to life, liberty and happiness through making false allegations to the Ann Arbor Police via a proxy, i.e. "Nick." Through the use of a proxy, the Defendants also violated Plaintiff's Sixth Amendment rights to confront one's accuser.

429. Further, Defendants' faculty Paul Cronin and Aine Kelly interfered with Plaintiff's parent's employment and as such the Plaintiff's right to life, liberty and the pursuit of happiness in a number of ways. These included making false statements regarding Plaintiff's family to University of Michigan investigations, refusing to participate in University investigations to clear Plaintiff family's good names, and spreading false rumors at the work environment regarding Plaintiff's family either directly or via proxy.

430. Defendant Ella Kazerooni interfered with Plaintiff's parents' employment at the University of Michigan as well as subsequent outside employment.

431. Defendant Ella Kazerooni violated due process by accepting Plaintiff Maria Foerster mother's resignation in good standing and subsequently referred the resignation to the UM police for "suspicious circumstances" as well as using the resignation circumstances to interfere with outside employment opportunities.

432. Defendant Ashok Srinivasan repeatedly refused to offer Plaintiff's mother Dr. Petrou an interview in 2019 and 2020 even though Dr. Petrou was clearly qualified for the position per Dr. Ashok's own assessment in 2018.

433. The Defendants endorsed/refused to investigate "Nick" when asked and subsequently ran a sham investigation into "Nick's" allegations without talking to the Plaintiff or the other relevant parties.

434. The Defendants endorsed/refused to investigate a federal agent ("Tyson Howard") used to intimidate and muzzle the Plaintiff in an effort to cover up its wrong-doing.

435. Based upon the above facts, federal agent "Tyson Howard" is presumed to be affiliated with and used as a proxy by the Defendants.

436. The actions of the Defendants have inflicted long term and ongoing damages to Plaintiff Maria Foerster and her family including loss of their home and assets, destruction of Maria Foerster's credit rating resulting in inability to purchase a home and other items, loss of long standing personal and professional relationships and disruptions of friendships and relationships, loss of job stability, loss of place of worship, preclusion from expanding Plaintiff's family as planned/interference with Maria's parents' reproductive rights, being forced to work in unsafe and hostile work environments and compromise of extended family relationships.

437. The acts of the Defendants were intentional and performed with the intent to deprive Plaintiff Maria Foerster of her constitutional rights, or with reckless and utter indifference as to whether such deprivation would occurs.

438. The actions of the Defendants were the proximate cause of the Plaintiff Maria Foerster's damages.

439. The actions of the Defendants were the cause-in-fact of Plaintiff Maria Foerster's damages.

440. As a direct results of the Defendants' actions, Plaintiff Maria Foerster has been effectively rendered a refugee in her own county, an egregious violation of her rights.

## SECOND CAUSE OF ACTION
### *Violation of Conspiracy to Violate Constitutional and Civil Rights Under 42 U.S.C. § 1985*

441. Plaintiff Maria Foerster realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

442. Based on the facts set forth herein and in the proceeding paragraphs, all the Defendants are liable to Plaintiff Maria Foerster for conspiracy to violate her constitutional rights under 42 U.S.C. § 1985.

443. These Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Plaintiff Maria Foerster.

444. The actions of these Defendants demonstrate a well-organized plan involving at least five people to fabricate false criminal allegations against Plaintiff and her family, extort and harass Plaintiff and her family, execute improper and unconstitutional search warrant through unlawful methods and the taking of property and employment rights without due process.

445. These Defendants and/or an agent thereof engaged in a concerted action.

446. The action was designed to accomplish either a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means.

447. These Defendants and/or an agent thereof illegally, maliciously  and wrongfully conspired with one another with the intent to and for the illegal purpose of defrauding and blacklisting Plaintiff's family from rightful employment.

448.  These Defendants and/or an agent thereof illegally, in combination, conspired to improperly obtain information, publicly humiliate, harass and embarrass in an effort to drive Plaintiff and her family from Ann Arbor, Michigan.

449. As a result of the conspiracy, and Defendants and/or agent thereof illegal, wrongful or tortious acts, Plaintiff sustained damages.

450. These Defendants are jointly, severally, and/or alternatively liable to Plaintiff for all her injuries and damages.

451. As a direct result and proximate cause of the violations described in this Complaint, Plaintiff has suffered and continues to suffer from including but not limited to severe and permanent embarrassment, legal expenses, and loss of earning capacity and property/assets of her family. Plaintiff is entitled to compensatory, exemplary and punitive damages.

## VI.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants for the following:

A. An immediate injunction enjoining Defendants and/or The University of Michigan from making reports to professional licensing boards for Plaintiff's parents, Dr. Bradley Foerster and Dr. Myria Petrou.

B.  An order declaring the conduct of the Defendants unconstitutional.

C. An order for the Defendants to issue a public apology for their actions.

D.  As part of the public apology, Plaintiff prays for the University of Michigan to donate 10 million dollars to the United Nations Refugee Agency in the name of Maria Eva Foerster.

E.  An order for the Defendants to release any testimony and/recordings given by or involving Paul Cronin and/or "Nick" as outlined in this complaint.

F.  An order for the Defendants to release any University of Michigan Department of Public Safety/Law Enforcement reports regarding or referring to Plaintiff and/or her family including Dr. Bradley Foerster and/or Dr. Myria Petrou.

G.  Plaintiff prays for restoration her parents' (Dr. Foerster's and Dr. Petrou's) academic faculty positions at the University of Michigan with credit given for lost time and grade.

H.  Plaintiff  prays for the restoration of ownership of her family's property of 630/620 Geddes Ridge, Ann Arbor, Michigan which is currently owned by faculty at the University of Michigan.

I.  Litigation costs reasonably incurred in this action.

J.  Award any other relief that this Honorable Court finds just and equitable.

## **<u>JURY DEMAND</u>**

**Plaintiff respectively demands a jury trial on all issues so triable.**

Dated:  November 15, 2021   _____

Maria Foerster (In Pro Per), Myria Petrou as next friend/mother
3507 Veralta Drive
Cedar Falls, IA 50613
(626) 272-7393

JS 44 (Rev 10 20)

# CIVIL COVER SHEET

County in which action arose: __Washtenaw__

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br>Maria Foerster | **DEFENDANTS**<br>Mark Schlissel, Marschall Runge, Nicholas Reed Dunnick, Ella Kazerooni, Eva Feldman, Ashok Srinivasan, Kara Morgenstern, Timothy Lynch |
| **(b)** County of Residence of First Listed Plaintiff __Black Hawk__<br>*(EXCEPT IN U S PLAINTIFF CASES)* | County of Residence of First Listed Defendant __Washtenaw__<br>*(IN U S PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Maria Foerster (In Pro Per)<br>3507 Veralta Drive<br>Cedar Falls, IA 50613 (626) 272-7393 | Attorneys *(If Known)* |

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br> & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br> Student Loans<br> (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br> of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br> Liability<br>☐ 320 Assault, Libel &<br> Slander<br>☐ 330 Federal Employers'<br> Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br> Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br> Product Liability<br>☐ 360 Other Personal<br> Injury<br>☐ 362 Personal Injury -<br> Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br> Product Liability<br>☐ 367 Health Care/<br> Pharmaceutical<br> Personal Injury<br> Product Liability<br>☐ 368 Asbestos Personal<br> Injury Product<br> Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br> Property Damage<br>☐ 385 Property Damage<br> Product Liability | ☐ 625 Drug Related Seizure<br> of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br> Act<br>☐ 720 Labor/Management<br> Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br> Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br> Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br> 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br> New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br> Act of 2016<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br> 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br> Corrupt Organizations<br>☐ 480 Consumer Credit<br> (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer<br> Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br> Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br> Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br> Accommodations<br>☐ 445 Amer. w/Disabilities -<br> Employment<br>☐ 446 Amer. w/Disabilities -<br> Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br> Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br> Conditions of<br> Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br> Actions | ☐ 870 Taxes (U.S. Plaintiff<br> or Defendant)<br>☐ 871 IRS - Third Party<br> 26 USC 7609 | Act/Review or Appeal of<br> Agency Decision<br>☐ 950 Constitutionality of<br> State Statutes |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332 Civil Action for Civil Rights Violations under Diversity of State Citizenship and Amount Greater than $75K

Brief description of cause:
Civil Action for Civil Rights Violations under Diversity of State Citizenship and Amount Greater than $75K

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:

JUDGE _____ DOCKET NUMBER _____

DATE
November 15, 2021

SIGNATURE OF ATTORNEY OF RECORD
_____ MARIA PETROV ( AS next Friend)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.  Is this a case that has been previously dismissed?  ☐ Yes  ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously
    discontinued or dismissed companion cases in this or any other  ☐ Yes
    court, including state court? (Companion cases are matters in which  ☒ No
    it appears substantially similar evidence will be offered or the same
    or related parties are present and the cases arise out of the same
    transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :